No. 47,826

CHARLES C. HOOVER, *Appellant,* v. THE EHRSAM COMPANY, *Appellee.*

(544 P. 2d 1366)

Opinion filed January 24, 1976.

*William A. Hensley,* of Turner and Hensley, Chartered, of Great Bend, argued the cause, and *Lee Turner* and *Raymond L. Dahlberg* of the same firm were on the brief for the appellant.

*John F. Christner,* of Abilene, argued the cause and was on the brief for the appellee.

The opinion of the court was delivered by

HARMAN, C.: This is an appeal by an employee from a district court's denial of a workmen's compensation claim. The case turns upon whether, at the time of injury, claimant was removed from

workmen's compensation coverage by reason of doing work which he had been prohibited from performing.

Claimant Charles C. Hoover was an employee of respondent Ehrsam Company, a self-insurer, which company engaged in machine and foundry work, including the processing of sheet metal. Claimant started working for respondent in 1953 after navy service which resulted in a lung disability, and he continued that employment until his injury in May, 1972.

Claimant performed manual labor in various departments in respondent's plant up until sometime in 1969 when he was made a lead man or supervisor and was forbidden by respondent to do any kind of manual labor. Thereafter his job was solely to supervise and direct those working under him.

Throughout his employment with respondent claimant appears to have been a good, faithful, hardworking employee, despite the fact he suffered a good bit of physical disability of different kinds. In 1960 claimant hurt his back in a fall on ice; he testified his back had never since been the same. He received some workmen's compensation from this fall. In 1967, while lifting some material, he hurt his lower back. He consulted and was treated by an osteopathic physician, Dr. Carson, who was his family physician and also doctor for the company. He was able to return to work some time thereafter but he consulted Dr. Carson periodically in 1968, 1969, 1970 and 1971 with recurrences of his back problem. During this same period Dr. Carson also treated claimant for a problem with his neck. He was hospitalized at various times and in 1970 underwent neck surgery consisting of a cervical disc removal.

On April 28, 1972, Dr. Carson saw claimant again. They discussed claimant's ailments: Neck, shoulder and arm pain, his surgery and his low back problems; dizziness and blackouts; a mild to moderate hearing disorder; abdominal problems diagnosed as pancreatitis, and apparently some nervous and emotional problems. Claimant brought up the subject of retirement. Dr. Carson believed claimant was in no condition to continue work and he advised claimant to consider retirement and discuss it with his wife. On May 1, 1972, claimant told the doctor he wished to retire if he could work out a financially feasible way to do so. Meanwhile respondent apparently was in the process of being taken over by a larger company and the department in which claimant worked was to be closed. During the first week in May claimant learned he would retire on June 1, 1972.

On or about May 10, 1972, a version press in the sheet metal department jammed or locked. Claimant was a lead man in this department. Apparently there were two different methods used to release the press when this occurred. One method was to place a large stillson wrench on the end of the shaft and then apply power to the wrench by means of a chain hoist. A second method was to place a piece of shafting in the flywheel and use manual leverage to turn the jammed flywheel back so as to release the press. This method required the use of four men to exert sufficient leverage. The only testimony on the subject was that one man alone could not thus unjam the press.

At the time in question a workman under claimant had procured a large wrench from the tool room and had placed it on the end of the shaft. While this workman was attaching the wrench to the hoist claimant put a jack bar in the flywheel, pulled downward on the bar, then collapsed and fell. At the time there were other workmen available in the immediate area to assist in releasing the jam. Claimant made report of his accident to respondent on May 12 but did not mention it to Dr. Carson on May 15, 1972, when he consulted the doctor in the Abilene hospital where he had gone for emergency treatment for pancreatitis. Claimant last worked for respondent on May 11.

Prior to any adjudication in this proceeding, and at a time not disclosed in the record but apparently as a part of claimant's retirement, claimant and respondent worked out some sort of agreement whereby respondent paid claimant $1,544.00 in a lump sum— this ostensibly in settlement of claimant's back injury in 1967 and his 1970 neck condition. Also respondent agreed to pay claimant $56.00 per week workmen's compensation for a period of twenty-six weeks—this, according to respondent's personnel manager, "until he would get his social security and his V. A. pension and this sort of thing". Dr. Carson had advised respondent that claimant should be retired for disability. In connection with claimant's May 10 accident respondent also paid $5.00 to Dr. Carson and a drug prescription bill of $6.95.

The examiner and the director of workmen's compensation upon review awarded claimant compensation for temporary total disability for 415 weeks for his May 10, 1972, accident. The director specifically found claimant had not deliberately intended to injure himself. Upon respondent's appeal the district court reversed the

award for reasons stated in its memorandum opinion as follows:

"  .  .  .

"6. The court does find specifically that the claimant was injured on the date in question.

"7. The injury occurred while the claimant was attempting to release a machine that had jammed.

"8. The claimant, on April 28, 1972, consulted with a doctor concerning retirement by reason of his physical disabilities.

"9. The claimant again saw the doctor on May 1, 1972, advising the doctor that he would retire if he could receive Workmen's Compensation.

"10. The claimant knew through meetings with the respondent that retirement would be effective June 1, 1972.

"11. Subsequent to the accidents set forth in paragraph 3 above, and prior to the date in question, claimant was retained in employment subject to specific limitations on his employment.

"12. Claimant's job obligation and employment agreement specifically excluded him from direct manual labor without the use of a compensating installed mechanical device.

"13. Claimant was at the time material hereto employed as a lead man, a supervisory job.

"14. The personnel under the supervision of the claimant knew that he was to perform no direct manual labor.

"15. At the time of the accident, the claimant was attempting to release a jammed 'version press' by using a jack bar as a fulcrum, by pulling down with his hands and body to release the jam.

"16. The machine held dies weighing between 200 and 500 pounds.

"17. Restricted employment subject to mental' or physical limitations is a procedure to be approved.

"18. Restrictions placed on an employee which do not preclude him from fulfilling his job obligation limit the scope of his employment.

"19. The claimant exceeded the confine of his employment.

"20. The injuries sustained by the claimant did not arise out of or in the scope of his employment."

The court made no finding as to any notice on respondent's part that claimant would violate its order not to engage in manual labor.

Claimant-appellant's first contention is that the trial court erred factually in finding that his job obligation specifically excluded him from direct manual labor "without the use of a compensating installed mechanical device". He says there was no mention in the evidence of such a device in connection with appellant's prohibition. The record before us supports this contention but it is of no moment in determining the matter at issue. Undoubtedly the court had in mind the method of releasing the jam by chain hoist, as described in the testimony. The record is clear appellant was expressly directed by at least three different company officers not to perform manual labor in his job. The matter complained of is surplusage and

may be disregarded. More serious is the assertion of error in the finding that appellant's injury did not fall within the purview of the workmen's compensation act.

The claimant has the burden of establishing that the injury to the workman occurred as a result of an accident arising out of and in the course of the workman's employment. This means a district court's determination on those issues will not be disturbed on appellate review where there is substantial evidence to support it. The phrase "in the course of" employment relates to the time, place and circumstances under which the accident occurred, and means the injury happened while the workman was at work in the employer's service (*Newman v. Bennett*, 212 Kan. 562, 512 P. 2d 497).

Did appellant's injury arise in the course of his employment when it occurred as a result of work he had been forbidden to do? One broad and generally accepted rule on the subject is stated in 1 Larson, Workmen's Compensation Law, § 27.00, p. 5-212, as follows:

"An act outside an employee's regular duties which is undertaken in good faith to advance the employer's interests, whether or not the employee's own assigned work is thereby furthered, is within the course of employment."

This rule brings within the course of employment any activity undertaken by one employee to assist a co-employee in the latter's performance of his work, the rationale for which is pointed out by Larson, ibid., § 27.12:

"The reason for this holding is simple: it would be contrary not only to human nature but to the employer's best interests to forbid employees to help each other on pain of losing compensation benefits for any injuries thereby sustained. This is well illustrated by the cases in which claimant, who has ceased to work at a particular machine, goes to the aid of his successor who is having trouble operating the machine. . . ." (p. 5-217.)

What happens then if the act which the employee undertakes is one that is *positively prohibited* by his employer, even though it assists a co-employee and is intended to advance the employer's work and interests? The general rule here is stated in 1A Larson, Workmen's Compensation Law, § 31.00, as follows:

"When misconduct involves a prohibited overstepping of the boundaries defining the *ultimate work* to be done by the claimant, the prohibited act is outside the course of employment. But when misconduct involves a violation of regulations or prohibitions relating to *method* of accomplishing that ultimate work, the act remains within the course of employment." (p. 6-7.)

The rule was stated in *Bartley v. C-H Riding Stables, Inc.*, 296 Minn. 115, 206 N. W. 2d 660, in this fashion:

" '. . . [I]f the employee is performing work which has been forbidden, as distinguished from doing his work in a forbidden manner, he is not acting in the course of his employment.' " (p. 118.)

In *Bartley* the employee, an eighteen year old boy, was hired to work at the employer's riding stables. His exact duties were never defined although there was evidence he was to be trained as a trail guide. The employer owned a high spirited horse which had thrown two other employees who attempted to ride it. The employer forbade the boy to ride the horse because the boy was "too thin to handle it". In the employer's absence the boy attempted to ride the horse, which threw him and caused the injuries for which workmen's compensation was sought. In denying the claim, the court stated:

"There are definite policy reasons underlying the distinction between a prohibited act and a prohibited manner of accomplishing a legitimate end. A prohibition against accomplishing a task in a certain manner is more frequently disregarded by an employee. In spite of his misfeasance, the employee has the obvious purpose of accomplishing a legitimate goal (and, therefore, is conclusively within the work environment); and, inferentially, the work, in itself, is in furtherance of the employer's business. On the other hand, to hold the employer liable for an injury incurred while performing a prohibited act is to force the employer to become a constant watchdog. No course would be available to the employer to prevent infractions save the firing of an employee doing a prohibited act." (p. 118.)

In the case at bar appellant was employed to assign the work and serve in a supervisory capacity in his particular department. Though not specifically stated it is apparent appellee did not wish to terminate appellant's employment when his many ailments limited his physical ability and in order to retain him it changed his duties. In attempting to release the jammed press, appellant was not doing in a prohibited manner the "thing" he had been employed to do, i. e., assign and supervise the work. Instead he was doing a prohibited act and therefore his activity at the time of his injury was outside the scope of his employment.

Two exceptions to the foregoing rule have been made. One is when the employer has previously accepted the benefit of the forbidden practice with knowledge that the prohibition has been violated (1 Larson, § 27.14, p. 5-221). Appellant urges application here of that exception. The evidence relied upon is testimony by

a workman who was under appellant's supervision that "he was an energetic fellow"; further:

"Q. Now Charlie wasn't the kind of guy that would just turn around and watch someone do some hard work, was he; he would pitch in and help?

"A. Under ordinary circumstances, no, but when you shouldn't—

"Q. I am talking about the kind of fellow that he was, his disposition, his attitude.

"A. Yes.

"Q. That was just the kind of guy he was; he always tried to help?

"A. I have never had him refuse me when I needed help.

"Q. Everybody in the shop knew that, didn't they?

"A. I think everybody knew him, yes."

Also relied on is this testimony by appellant's supervisor:

"Q. He [appellant] was always an energetic, hardworking fellow?

"A. Yes, he was.

"Q. And it was kind of hard to keep him down, wasn't it?

"A. Yes.

"Q. So it is not surprising to you, is it, sir, that—for example, you told him not to do any heavy work or any physical manual labor, that he might on occasion ignore that and help somebody out; that is not surprising to you, is it?

"A. It is not surprising but he shouldn't be.

"Q. I understand that. We all agree it shouldn't be. But knowing the kind of fellow that Charlie is, it is not surprising to you, is it?

"A. No."

And, finally included is this testimony of Dr. Carson:

". . . Mr. Hoover did have considerable amount of emotional problems. And he was quite [an] aggressive person. Not hostile, but aggressive. And the company made mention to me they had difficulty with Mr. Hoover as they—they thought quite a bit of him as a worker to all due respect—a great deal of him as an employee and one reason they had made him a foreman so that he could—could have a soft job so to speak. But he habitually was found doing things that the foreman was not supposed to do."

(The director's order does contain testimony by appellant to the effect he had done some lifting to aid a fellow worker when he needed it, but on oral argument we were told this referred to appellant's work in 1967—prior to his interdiction on manual labor.) The evidence relied on amounted to this: Appellant was an energetic, hardworking fellow, willing to assist a fellow employee when the latter needed help, his nature was such it would not be surprising if he would ignore an order not to perform heavy labor in order to help someone out; and he was sometimes found doing things, unspecified, that a foreman was not supposed to do. We do not think this sufficient to invoke the exception. The trial court ob-

viously was not impressed with it. There was no indication appellant had ever before attempted single-handedly to release a jammed press, although on occasion the press had jammed, nor that he had ever done any type of physical labor approximating that effort, of which appellee had knowledge. The evidence simply does not show that appellee should have reasonably foreseen appellant's disregard of the express order not to perform manual labor.

A second exception which allows compensation even though the claimant engaged in prohibited conduct is "when a prohibition is so general in its terms that it is readily outweighed by the specific benefit to the employer [of the doing of the prohibited act]" (1 Larson, § 27.14, p. 5-222). Illustrative of this rule is *Hayes v. Ambassador Court, Inc.*, 58 N. J. Super. 215, 156 A. 2d 11. There a building superintendent slipped and fell while washing windows for a tenant of a furnished flat. The court held that the employer's statement that the claimant wasn't supposed to do anything for tenants was a mere "blanket interdiction" insufficient to prove that the employee was forbidden from washing the windows; further that a good will benefit accrued to the employer, and compensation was allowed. Here the prohibition was specific—appellant was not to perform any physical or manual labor. It was so well understood that one workman testified it was "common shop knowledge that he was not to do any physical labor at all." Manifestly the prohibition was imposed because of appellant's frailty and it went to the heart of his continued retention as an employee. As a self-insurer under the workmen's compensation law appellee was obviously concerned with the hazard of injury to appellant and it could scarcely benefit from appellant's attempt to unjam the press when other means were immediately available. Neither of the exceptions applies.

The evidence sufficiently supports the trial court's findings and the judgment is affirmed.

APPROVED BY THE COURT.