(735 P.2d 247)
No. 59,331

CHARLES L. CARTER, *Appellee,* v. KOCH ENGINEERING, *Appellant,* and AETNA INSURANCE COMPANY, *Insurance Carrier/Appellant.*

Opinion filed April 9, 1987.

*John L. Carmichael,* of Turner and Boisseau, Chartered, of Wichita, for appellants.

*Christine M. Tamburini* and *Edward J. Hund,* of Focht, Hughey & Hund, of Wichita, for appellee.

Before DAVIS, P.J., BRISCOE and BRAZIL, JJ.

BRAZIL, J.: Koch Engineering, Inc., and its insurance carrier, Aetna Insurance Company, both of which will be referred to as Koch, appeal the workers' compensation award made to an employee, Charles L. Carter.

Carter was working for Koch on August 16, 1983, operating a punch press when his right hand was crushed by the cutting dies on the machine. Carter had run such machines for Koch for six years prior to the accident and had never been disciplined for a safety violation. Material moving through the press would occasionally jam and the operator would need to free it to continue production.

Koch had certain procedures it taught machine operators to follow when a jam occurred:

(1) Turn off the power to the press;

(2) Slip a thin metal rod under the guard at the end of the press and try to free the material;

(3) Use pincer pliers to grab the material and try to free it;

(4) Remove the front of the guard that surrounds the dies in the compression area of the press and insert a set-up block to prevent the press from closing;

(5) Try again to move material with rod or pincer pliers;

(6) Contact foreman if set-up block, pliers, and rod are not available.

On August 16 Carter tried to clear a jam. He did not shut off the power. He tried to force the material through by hand, but had no luck. Carter opened the guard, exposing the cutting area, and tried to use a "little stick" he had found. He moved a counter that told the press when to cut the material so he would have some leeway before it cut again and then freed the material with his hand. Unfortunately, the freed material moved on through the press so quickly the dies compressed before Carter could remove his hand and it was crushed. Carter had looked for a set-up block but none was located near the press at the time.

Carter filed a workers' compensation claim on October 25, 1984. Koch alleged Carter was not entitled to compensation because he willfully failed to follow safety procedures. The administrative law judge (ALJ) found that Carter's failure to turn off the press and to find and use a set-up block was willful and, under K.S.A. 44-501(d), barred him from compensation. On ap-

peal, the Workers' Compensation Director reversed, finding Carter had not acted willfully as that term is used in K.S.A. 44-501(d), and that he was entitled to compensation based upon 65% loss of use of his right forearm. The director also granted Carter compensation for a fifteen-week healing period. Koch appealed to the district court; it found Carter had lost 80% of the use of his right forearm and Koch had not met its burden under K.S.A. 44-501(d) to prove Carter had willfully failed to use safety devices. The court also allowed the fifteen-week healing period.

Koch raises three issues on appeal. We will address its third issue as issues three and four.

**1. DOES SUBSTANTIAL COMPETENT EVIDENCE IN THE RECORD SUPPORT THE DISTRICT COURT'S FINDING THAT CARTER HAD LOST 80% OF THE USE OF HIS FOREARM?**

Koch makes two arguments under this issue. First, it notes that the only doctor to state an opinion about Carter's disability said he suffered a sixty-five percent impairment of function of the forearm. Koch then asserts, "The eighty-percent figure chosen by the District Court is without support, or mention, in the evidentiary record." This claim assumes that someone *must* mention the specific number chosen by the district court in order for its conclusion to be supported by the record. However, the doctor also described Carter's injury and loss of use of the hand and Carter testified about the post-injury functioning of his hand. "The existence, nature and extent of the disability of an injured workman is a question of fact [citations omitted]. Medical testimony is not essential to the establishment of these facts [citation omitted]; hence it is not necessary that a workman's disability be given a medical name or label." *Chinn v. Gay & Taylor, Inc.*, 219 Kan. 196, 201, 547 P.2d 751 (1976). Thus, the district court, as factfinder, was free to consider all the evidence and decide for itself the percent of disability Carter suffered. The number the doctor chose to apply was not controlling.

Koch next points to the court's use of the word "work" in the following paragraph of its opinion:

"[Carter] then can do 20% of the work he was doing with the injured arm and hand prior to his injury. He is therefore suffering from an 80% permanent partial disability to his right forearm."

The word "work," under Koch's argument, shows the court

confused the loss of use test properly applicable in this case with the work disability test used in general body disability cases. Immediately before reaching the quoted conclusion, however, the court reviewed the testimony of Carter relating to the functioning of Carter's hand:

"The Claimant testified that he was right handed. He cannot button the left sleeve of a shirt. He cannot make a fist. He must use the little finger of his right hand as one would normally use a thumb in order to grasp small objects. He cannot close any finger with the thumb of his right hand—the pincher movement. His thumb of the right hand will not move at all. The skin on the right hand is 'real sensitive.'

"The doctor testified that the Claimant will develop arthritis requiring additional surgery in the future."

This is the evidence the court was considering when it found Carter could "do 20% of the work he was doing . . . prior to his injury." By using the word "work," the court did not mean those activities Carter had performed at his job but all useful activities Carter could perform with his hand. The court would have reviewed Carter's job activities had it been applying the work disability test as Koch claims.

2. DID THE DISTRICT COURT HAVE AUTHORITY TO AWARD CARTER ADDITIONAL COMPENSATION FOR A HEALING PERIOD?

Carter was injured on August 16, 1983. He received temporary total compenstion for 51.71 weeks after which he returned to work for Koch.

The schedule for Carter's injury provided for 200 weeks of compensation. Both the director and the district court computed the award by first adding a fifteen-week healing period to the scheduled 200 weeks and substracting 51.71 weeks of temporary total disabilty for a net balance of 163.29 weeks.

K.S.A. 44-510d(b) provides:

"Whenever the employee is entitled to compensation for a specific injury under the foregoing schedule, the same shall be exclusive of all other compensation except the benefits provided in K.S.A. 44-510 . . . and no additional compensation shall be allowable or payable for either temporary or permanent disability, except that the director may, in proper cases, allow additional compensation during the actual healing period, such period not to be more than ten percent (10%) of the total period allowed for the scheduled injury in question nor in any event for longer than fifteen (15) weeks. The return of the employee to his or her usual occupation shall terminate the healing period."

Koch argues that the legislature meant for the healing period to apply only when a worker has received all compensation available for a scheduled injury but is still unemployed. However, Koch says, where an employee returns to work as soon as his injury has healed sufficiently for him to work again, allowing a healing period would provide double compensation for some of the weeks while the employee was temporarily totally disabled since the healing period ends when the employee returns to his or her usual occupation. Koch also argues the legislature did not intend to permit this double compensation because the Workmen's Compensation Act is intended to compensate injured workers for their loss of earning capacity, not to provide them with a windfall.

It appears, though, that the statute may be interpreted just as easily to support the district court's award. The statute does allow the director "in proper cases" to give the worker "additional compensation" for "the actual healing period." K.S.A. 44-510d(b). Double compensation certainly falls within the meaning of "additional." The direction that the healing period ends when the employee returns to his or her usual occupation would still apply in those cases where the employee returns to that work in less time than 10% of the scheduled injury period, up to fifteen weeks. This interpretation appears to give the director discretion to award healing period compensation for scheduled injuries any time the employee is unemployed while recovering from the injury. This construction is supported by the general rule that "the workmen's compensation act is to be liberally construed in favor of the workman and compensation is to be awarded where it is reasonably possible to do so. [Citation omitted.]" *Hensley v. Carl Graham Glass,* 226 Kan. 256, 258, 597 P.2d 641 (1979). The legislature could have stated that a healing period should be allowed only if temporary total or permanent disability ran out during the actual healing period if that is what it intended, but it did not do so.

The provision for healing period compensation first appeared in our Workmen's Compensation Act in 1927 (L. 1927, ch. 232, § 10[21]) and has remained virtually unchanged to the present. Compare K.S.A. 44-510d(b) with R. S. 1923, 44-510(3)(c)(21)

(1930 Supp.). Before the 1927 amendment, the pertinent portion of R. S. 1923, 44-510(3)(c)(23) read simply: "The compensation for the foregoing specific injuries shall be in lieu of all other compensation, except the benefits provided in paragraph 1 of this section." Under the amendment, this language was slightly altered and other language was added. The provision became R. S. 1923, 44-510(3)(c)(21) (1930 Supp.) and read:

"Whenever the workman is entitled to compensation for a specific injury under the foregoing schedule, the same shall be exclusive of all other compensation except the benefits provided in paragraph 1 of this section and no additional compensation shall be allowable or payable for either temporary or permanent disability: *Provided, however,* That the commission, arbitrator or committee may, in proper cases, allow additional compensation during the actual healing period, such period not to be more than ten (10) per cent of the total period allowed for the schedule injury in question, nor in any event for longer than fifteen (15) weeks: *Provided further,* That the return of the workman to his usual occupation shall terminate the healing period."

The provision is now found at K.S.A. 44-510d(b) quoted herein. The changes in the provision since 1927 do not appear to be significant for our purposes.

At one time, the Kansas Workers' Compensation Director had a regulation which dealt with the healing period. Effective January 1, 1966, this regulation provided in pertinent part: "A healing period is involved only in computations where there is a complete or partial 'loss of' [as opposed to 'loss of use of'] a scheduled member or when there is enucleation of an eye." K.A.R. 51-7-12 (Weeks 1965). In medicine, "enucleate" means "to remove without cutting into . . . shell out from a capsule." Webster's Third International Dictionary 759 (1971). This regulation was amended effective January 1, 1973, to read:

"Additional compensation for a healing period in case of amputation may be allowed by the director, such period to be not more than ten (*10*) percent of the total period allowed for the scheduled injury in question, nor in any event longer than *fifteen* (15) weeks. *The return of the workman to his usual occupation shall terminate the healing period.* [Emphasis in original.]" K.A.R. 51-7-12 (1973 Supp.).

The 1977 amendment merely removed the italics and changed "workman" to "worker." K.A.R. 51-7-12 (1977 Supp.). The 1978 amendment inserted a new sentence between the two quoted above which read: "Additional compensation for healing period

in cases of scheduled injury, not an amputation, may be allowed by the director in proper cases." It also replaced "his" in the last sentence with "his or her." K.A.R. 51-7-12 (1978). Finally, this regulation was revoked in 1983. K.A.R. 51-7-12 (1984). This may have been done because the new sentence rendered the regulation no more informative than the statute itself.

The amputation limitation in the regulation almost certainly was drawn from *Hering v. San Ore Construction Co.*, 130 Kan. 70, 285 Pac. 592 (1930). In that case, citing only the statute, the court declared, "The extra compensation for the healing period is allowed in cases of amputation only." 130 Kan. at 74. However, as noted in *Shank v. Mid-America Drilling Co.*, 5 Kan. App. 2d 618, 621, 621 P.2d 1019 (1981), the supreme court has not always followed the rule stated in *Hering. Riggan v. Coleman Co.*, 166 Kan. 234, 237-38, 200 P.2d 271 (1948) (loss of use of arm), *overruled on other grounds Bryant v. Excel Corp.*, 239 Kan. 688, 692, 722 P.2d 579 (1986); *Schweiger v. Sheridan Coal Co.*, 132 Kan. 798, 800-02, 297 Pac. 688 (1931) (loss of use of eye). See also the following non-amputation cases: *Rogers v. Board of Public Utilities*, 158 Kan. 693, 702, 149 P.2d 632 (1944) (double hernia); *Gallivan v. Swift & Co.*, 136 Kan. 234, 237, 14 P.2d 665 (1932) (loss of use of two fingers and surface injury to palm of hand). Thus "proper cases" (44-510d[b]) do not seem to be limited to amputation cases.

The *Riggan* case has suggested an explanation for the treatment by the legislature and the court of the healing period. In that case, the worker suffered an injury which ultimately cost him the use of his right arm; he was completely unable to work for about 120 weeks after the accident. 166 Kan. at 234-35. The district court awarded him 119 weeks of compensation for temporary total disability and added to that the full 210 weeks allowed under the schedule for permanent loss of use of his arm. 166 Kan. at 234-35. The supreme court admitted that cases before the 1927 amendment provided much support for the trial court's decision. 166 Kan. at 236 (citing *Lane v. Sonken-Galamba Corporation*, 119 Kan. 256, 237 Pac. 875 [1925]). The court quoted the then-current version of K.S.A. 44-510d(b), noted that it was bound to follow the legislative intent despite its own sympathies, and said:

"Faced by an undisputed situation such as we have heretofore described and an express legislative fiat directing that no additional compensation shall be allowable for either temporary or permanent disability where a workman is entitled to compensation for a scheduled injury we believe there can be but one answer. That is that the trial court, having found the appellee had suffered the loss of the use of an arm, did not have power to allow appellee additional compensation for temporary incapacity in excess of the fifteen-weeks healing period authorized by the statute and to which we hold he was entitled under the uncontroverted evidence." 166 Kan. at 237.

Thus, it appears that before the 1927 amendment, a worker who was temporarily totally disabled by a scheduled injury could receive compensation for that period and still receive the full scheduled compensation for the injury after healing as much as the injury would allow. With this in mind, then, the legislature set about eliminating the extra compensation for the period of temporary disability. For some reason, though, the legislature decided not to go quite all the way and created the extra healing period compensation for those workers who were unable to return immediately to work after their injuries. The reason may be as follows. Without the healing period under the new system, a worker who lost a hand, for example, would receive 150 weeks of compensation (K.S.A. 44-510[a][11]) whether he or she returned to his or her usual occupation the next day, a month later, or a year later. The healing period, then, to a limited extent, allows additional compensation for a delay in returning to work. In a case such as ours, the temporary total disability award adds to the worker's award only if his or her permanent scheduled disability is a partial loss of, or loss of use of, the scheduled member since the number of weeks of compensation is multiplied by the percent of partial disability only after the weeks of total disability are subtracted. This view of the healing period compensation appears to explain the cases where the supreme court has directed it to be awarded. *Bergemann*, 215 Kan. 685; *Riggan*, 166 Kan. 234; *Gallivan*, 136 Kan. 234. A "proper case" under 44-510d(b), then, would be one where the worker suffers only a scheduled injury but is unable to return to work immediately. On the other hand, where the worker is temporarily totally disabled by other injuries in addition to the scheduled one but suffers only the scheduled one permanently, the healing period would not be proper because this worker is entitled to receive

the full scheduled amount in addition to the temporary total disability. See, *e.g., Cramer v. Blankenship Painting & Decorating Co.,* 202 Kan. 531, 535-37, 449 P.2d 555 (1969); *Chamberlain v. Bowersock Mills & Power Co.,* 150 Kan. 934, Syl. ¶ 2, 96 P.2d 684 (1939); *Resnar v. Wilbert & Schreeb Coal Co.,* 132 Kan. 806, Syl. ¶ 1, 297 Pac. 429 (1931).

A weakness in Koch's argument about the healing period awarded in this case is that it assumes that the weeks used to measure the compensation due for temporary total disability, the healing period, and a scheduled injury all have the same significance. They are actually used simply to arrive at the amount of compensation due to a worker, but their relationship to reality is quite different. Weeks used to measure temporary total disability are those real weeks during which "the employee, on account of the injury, has been rendered completely and temporarily incapable of engaging in any type of substantial and gainful employment." K.S.A. 44-510c(b)(2). Weeks used to measure the healing period are those real weeks, artificially limited to fifteen weeks, after the injury which pass before the worker returns to his or her usual occupation. K.S.A. 44-510d(b). Weeks used to measure a scheduled injury are completely artificial, bearing no relationship in fact to the real time it takes the worker to recover from the injury or learn to compensate for the injury to the scheduled member of his or her body. They simply represent, when multiplied by the weekly rate of compensation, the legislature's declaration of the amount of money a worker should receive as compensation for the listed injuries. This combination of weeks which are completely dependent on, only to a relatively small limit dependent on, and completely independent of, the individual worker's actual condition makes Koch's argument that Carter has been doubly compensated sound more plausible than it actually is.

In Carter's case, the healing period compensation may be properly awarded because he will then receive: (1) full compensation for those weeks on the schedule during which he lost all use of his right forearm; (2) compensation for 80% of those weeks remaining on the schedule because the legislature (and/or the court) has said he should receive those weeks when he has permanently lost 80% of the use of his right forearm; (3) and 80%

of fifteen additional weeks of compensation simply because the legislature (and/or the court) said he is entitled to that where he has missed work, up to 10% of the number of weeks provided on the schedule for his injury, but not more than fifteen weeks.

Koch closes its argument under this issue by asserting the court improperly calculated Carter's award under K.A.R. 51-7-8. The pertinent portion of that regulation reads:

"If a healing period . . . is granted, it shall be added to the weeks on the schedule or partial schedule prior to the following computations being made.

"If a loss of use occurs to a scheduled member of the body, compensation shall be computed as follows: deduct the number of weeks of temporary total compensation from the schedule; multiply the difference by the percent of loss of use to the member; and multiply the result by the applicable weekly temporary total compensation rate."

The district court determined Carter "would be eligible for 130.63 weeks compensation at the maximum rate for permanent partial disability to his forearm (K.S.A. 44-510d[a][12])." The court obtained that result this way: "[(200 wks. schd. + 15 wks. healing) - 51.71 wks. temp. tot.] x .80 p.p." The director, who held Carter lost 65% use of his forearm, made this calculation:

"[C]ompensation would be computed by beginning with the schedule of 200 weeks for the forearm and adding thereto the healing period of 15 weeks, making a starting point for the computation of 215 weeks. From this sum is subtracted the weeks of temporary total disability compensation of 51.71 weeks, leaving a net of 163.29 weeks which is multiplied by 65% and results in 106.14 weeks for permanent partial loss of use."

Koch admits the director's computation is correctly done. The court made the same calculation except it substituted its own finding of 80% permanent partial loss of use. We find no error.

### 3. DID CARTER'S FAILURE TO USE THE SAFETY DEVICES TAKE HIS ACTIVITIES BEYOND THE COURSE OF HIS EMPLOYMENT?

Koch raised this issue before the trial court and again on appeal by incorporating by reference the argument made in its submission letter directed to the ALJ. In *Hoover v. Ehrsam Company*, 218 Kan. 662, 544 P.2d 1366 (1976), the district court had held that an employee, who had been forbidden to do manual labor, acted outside the scope of his employment when he tried to release a machine that had jammed. 218 Kan. at 665. The supreme court noted this determination would not be dis-

turbed if supported by substantial evidence. 218 Kan. at 666. The court quoted the following rule from 1A Larson, Workmen's Compensation Law § 31.00:

" 'When misconduct involves a prohibited overstepping of the boundaries defining the *ultimate work* to be done by the claimant, the prohibited act is outside the course of employment. But when misconduct involves a violation of regulations or prohibitions relating to [the] *method* of accomplishing that ultimate work, the act remains within the course of employment.' (p. 6-7.)" (Emphasis in original.) 218 Kan. at 666.

The court affirmed the trial court's decision. 218 Kan. at 667. *Hoover* shows that the district court's decision here should not be overturned since Carter violated rules which related to the method of running the punch press while his ultimate work was to run the press, which he was doing.

4. DID THE DISTRICT COURT ARBITRARILY DISREGARD UNDISPUTED EVIDENCE WHEN IT CONCLUDED KOCH HAD NOT MET ITS BURDEN TO PROVE CARTER WILLFULLY FAILED TO USE THE SAFETY DEVICES?

K.S.A. 44-501 now provides in pertinent part:

"(d) If it is proved that the injury to the employee results . . . from the employee's willful failure to use . . . a reasonable and proper guard and protection voluntarily furnished the employee by the employer . . . any compensation in respect to that injury shall be disallowed."

In 1916 the Workmen's Compensation Act contained the following parallel provision:

"[I]f it is proved that the injury to the workman results . . . from his willful failure to use . . . a reasonable and proper guard and protection voluntarily furnished him by said employer . . . any compensation in respect to that injury shall be disallowed." L. 1911, ch. 218, § 1; *Messick v. McEntire*, 97 Kan. 813, 815, 156 Pac. 740 (1916).

See also R. S. 1923, 44-501(b); G. S. 1949, 44-501(b) (Corrick). In *Binger v. Read*, 101 Kan. 303, 165 Pac. 821 (1917), the court held that the question of the adequacy of a guard had properly been sent to the jury. In *Thorn v. Zinc Co.*, 106 Kan. 73, 186 Pac. 972 (1920), the employee had been awarded compensation despite his failure, in violation of the employer's posted notice, to shut off a machine when it became jammed. 106 Kan. at 73-74. The court said, "To warrant a reversal the court must declare as a matter of law that the injury resulted from his willful failure to

use a guard and protection furnished by his employer." 106 Kan. at 75. The court affirmed the award with this explanation:

"The question whether the failure to stop the machinery brought the plaintiff within the statutory exception is more difficult. In a sense it may be said that the rule adopted requiring the machinery to be shut down in case the rollers became choked, a convenient means for the purpose being supplied, constituted a reasonable and proper guard and protection against the risk that would result from an attempt to remove the obstacle while the rollers were in motion. But if that construction were adopted, it would seem that a recovery would be prevented whenever a workman was injured in consequence of his neglecting to follow a rule adopted by his employer for his benefit, or of his pursuing a dangerous method of accomplishing an object where a safer one had been provided. Such a course would clearly constitute negligence, and might even be characterized as willful misconduct, but we conclude that it is not the kind of delinquency that was within the mind of the legislature when it denied a recovery to one who was injured through his willful failure to use a guard and protection furnished him by his employer." 106 Kan. at 75-76.

Later that same year, the court considered the provision once again. In *Bersch v. Morris & Co.*, 106 Kan. 800, 189 Pac. 934 (1920), the employee again recovered compensation despite his failure to use a guard that would have prevented the injury. 106 Kan. at 801. The court held:

"While he did this contrary to instruction, and so may be said to have been guilty of conscious, voluntary omission, he did not mean to oppose his will to the will of his employer, in any perverse or refractory sense. At least, the members of the jury, who saw the man, gauged his capacity, formed an opinion of his disposition, and weighed his testimony, were authorized to reach that conclusion." 106 Kan. at 803.

The court went on to hold "that the meaning of the word 'willful,' as used in the statute includes the element of intractableness, the headstrong disposition to act by the rule of contradiction. . . . 'Governed by will without yielding to reason; obstinate; perverse; stubborn; as, a willful man or horse.' (Webster's New International Dictionary.)" 106 Kan. at 804.

*Thorn*, 106 Kan. 73, makes clear that violation of instructions from the employer alone is not enough to render the employee's action, as a matter of law, "willful" under 44-501(d). *Bersch*, 106 Kan. 800, adds that the question of the willfulness of the employee's acts is one for the factfinder to decide. The evidence here was such that the factfinder was authorized to conclude Carter had acted merely negligently or even with gross negli-

gence, but something short of intractably, without yielding to reason, obstinately or perversely. There may have been evidence to support a finding of willful action as well, but conflicts in the evidence are left to the factfinder, here the district court. K.S.A. 44-556(a) and K.S.A. 1986 Supp. 77-618 (continuing the prior de novo review of the facts by the district court). Koch relies solely on the passage of time in arguing these cases should no longer control, but their reasoning still appears sound.

Affirmed.